UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GENERAL SECURITY INC.,

                     Plaintiff,

     -against-

COMMERCIAL FIRE & SECURITY, INC.,
WAYNE WAHRSAGER, and STEVEN MORAN,

               Defendants.
-----------------------------------------------------------X

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**
CV 17-1194 (AYS)

**APPEARANCES:**

    SOKOLOFF STERN LLP
    BY:   ADAM I. KLEINBERG, ESQ.
         DANIEL RYAN AXELROD, ESQ.
    Attorneys for Plaintiff
    179 Westbury Avenue
    Carle Place, New York 11514

    KIRSCHENBAUM & KIRSCHENBAUM ESQ.
    BY:   KIERAN X. BASTIBLE, ESQ.
         STEVEN B. SHEINWALD, ESQ.
    Attorneys for Defendants
    200 Garden City Plaza
    Suite 500
    Garden City, New York 11530

**SHIELDS, United States Magistrate Judge:**

Plaintiff, General Security Inc. ("Plaintiff" or "General Security"), commenced this action on

March 2, 2017, against Defendants, Commercial Fire & Security, Inc. ("Commercial Fire"),

Wayne Wahrsager ("Wahrsager"), and Steven Moran ("Moran") (collectively, "Defendants"),

alleging claims for: (1) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836; (2)

violation of the Lanham Act, 15 U.S.C. § 1125(a); (3) violation of Section 360-l of the New

York General Business Law; (4) tortious interference with contractual relations; (5) tortious

interference with prospective economic advantage; (6) misappropriation of trade secrets; and, (7)

unjust enrichment. (Docket Entry ("DE") [1].) Plaintiff amended its Complaint on May 26, 2017.

(DE [13].) During discovery, the parties consented to the jurisdiction of this Court for all

purposes. (DE [51].) A non-jury trial commenced on July 6, 2022 and concluded on July 7, 2022.

In November 2022, the parties submitted proposed findings of fact and conclusions of law. (DE

[83], [84].) Upon consideration of those submissions and the proceedings herein, this constitutes

the Court's Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

I.      The Parties and the Witnesses Who Testified at Trial

1.      Plaintiff General Security and Defendant Commercial Fire are both security system
        installation, servicing and monitoring companies with residential and commercial
        clients. (Tr. 48.)

2.      New York Merchants Protective Co. ("NYMP") was a longtime alarm company with
        a strong reputation in the metropolitan area. (Tr. 3, 62.)

3.      Defendant Wahrsager is a prior owner of NYMP and a current employee of
        Commercial Fire. (Tr. 3, 273.)

4.      Defendant Moran is a former employee of General Security who now works as a
        salesperson for Commercial Fire. (Tr. 78-79, 292.)

5.      General Security presented the factual testimony of: (1) Alfred Schwimmer
        ("Schwimmer"); (2) Reverend Regina Johnson ("Reverend Johnson"); (3) Grace
        Cirillo; (4) Vincent DeRosa ("DeRosa"); (5) Richard Sayres ("Sayres"); (6) Dr. Mila
        Sorkin ("Dr. Sorkin"); (7) Sandeep Patel ("Patel"); and, (8) Michael Lepine, all
        former customers of NYMP. Plaintiff also presented the testimony of John Lupino
        ("Lupino"), the general manager of General Security. While some witnesses testified

in person, others' testimony was presented via their deposition transcripts, as noted

herein, due to their unavailability to appear at trial, based upon the parties'

stipulation.

6.   Commercial Fire presented the factual testimony of Defendant Wahrsager.

7.   Neither Plaintiff nor Defendant presented any expert testimony.

II.   <u>Wahrsager's Termination from NYMP</u>

8.   In November 2010, Bank of America brought a federal lawsuit against Wahrsager to

recover $19 million with regard to a loan made to NYMP. (Tr. 323.)

9.   In December 2010, Wahrsager sent a letter to all NYMP customers releasing them

from their alarm contracts with NYMP. (Tr. 328-29; Pl. Ex. 1.)

10.   The federal court appointed a receiver and Wahrsager was terminated from his

employment with NYMP in January 2011. (Tr. 324-25; Pl. Ex. 2.)

11.   In May 2011, the federal court issued an order to Wahrsager: (1) directing him to not

interfere, directly or indirectly, with the receiver's operation of NYMP; (2)

terminating his employment with NYMP; (3) directing him to vacate the premises of

NYMP; and, (4) directing him to turn over his keys and access code to NYMP. (Tr.

328.)

12.   Moran's employment with NYMP also ended in 2011. (Tr. 79.)

13.   Pursuant to a consent judgment, Wahrsager was precluded from soliciting NYMP

customers through March 2014. (Tr. 334; Pl. Ex. 8.)

III.   <u>The 2016 Asset Purchase Agreement</u>

14.   On or about November 1, 2016, an asset purchase agreement (the "Purchase

Agreement") was entered into between General Security and NYMP Acquisition LLC

("NYMP LLC"), by which General Security purchased all of NYMP's assets for the sum of $4,841,431.12. (Tr. 54; Pl. Ex. 11.)

15.  Pursuant to the Purchase Agreement, General Security purchased customer accounts and related contracts previously owned by NYMP, as well as intellectual property rights, the exclusive right to use the trade name and logo "New York Merchants Protective Company" and telephone numbers used by NYMP for customer service. (Tr. 61-63; Pl. Ex. 16.)

16.  As part of the Purchase Agreement, General Security purchased approximately 3,280 accounts from NYMP, with a recurring monthly revenue ("RMR") of approximately $146,000 per month. (Tr. 51, 56, 156.)

17.  RMR is the amount of money an account is billed each month for the services provided by General Security, presuming a customer pays their bill on time. (Tr. 56.)

18.  In the Purchase Agreement, a multiple was used to determine the purchase price for the accounts purchased from NYMP, based on the type of account. (Tr. 58; Pl. Ex. 11.)

19.  For "contracted" customers, the Purchase Agreement provided for a RMR multiple of "42," which equates to forty-two months of revenue for those customers that were under a contract that was still in effect at the time of the purchase. (Tr. 58.)

20.  For "non-contracted" customers – customers whose initial contracts had expired but, pursuant to the renewal clause contained therein, were still under contract on a month-to-month basis, a RMR multiple of "28" was applied. (Tr. 58-60.)

21.  The Purchase Agreement also contained a holdback clause, which is typical in the alarm industry because the purchaser expects that there will be a normal loss of

4

accounts, particularly in the first year post-purchase. The holdback clause represents a portion or percentage of accounts that are withheld to potentially cover that first year's loss of accounts. (Tr. 63.)

22. The holdback clause sum was twenty percent, or $968,286.00, which was not paid by General Security at the closing of the purchase of NYMP and was instead held back until the holdback period passed. (Tr. 63-64, 76.)

23. The holdback period was twelve months for contracted accounts and eighteen months for non-contracted accounts. (Tr. 63-64, 157-58.)

24. If an account is subject to the holdback clause, it is reassigned to the seller – here, NYMP – and the rights of that contract return to the selling entity. (Tr. 64.)

25. Following the closing of the Purchase Agreement, a letter was sent to NYMP customers advising them of the sale to General Security. No NYMP customers called to cancel their accounts immediately following the mailing of the letter. (Tr. 70-72; Pl. Ex. 20.)

IV. <u>Customer Cancellations</u>

26. Post-closing of the Purchase Agreement, General Security began to receive cancellation notices from certain of the accounts purchased, many of whom mentioned Commercial Fire. (Tr. 73-74.)

27. In total, sixty-nine accounts procured through the Agreement who canceled their accounts with General Security entered into accounts with Commercial Fire. (Tr. 88, 144-45.)

28. Lupino, General Security's general manager, discovered the sixty-nine accounts by running queries on accounts and reports on cancellations with cancellation dates and reasons. (Tr. 144-45; Pl. Ex. 58.)

29. Of the sixty-nine accounts, fifty-six were subject to the Agreement's holdback provision, with all rights related thereto being transferred back to NYMP LLC. (Tr. 172.)

    A.    <u>Alfred Schwimmer – Nasau Kosher Meats</u>

30. Schwimmer is the owner of Nassau Kosher Meats ("Nassau Kosher"), located in East Meadow, New York. (Tr. 9-10.)

31. In 2013, Nassau Kosher contracted with NYMP for alarm service. (Tr. 10-11.)

32. In February 2017, Moran went to Nassau Kosher to solicit its alarm business. (Tr. 14, 19.)

33. Nassau Kosher had no prior contact with Moran and had not contacted anyone about changing security companies. (Tr. 14, 19.)

34. Moran knew about Nassau Kosher's equipment and its NYMP account number. (Tr. 19.)

35. Moran told Schwimmer that NYMP was breaking up into territories and that he would be Nassau Kosher's representative. (Tr. 15-16.)

36. Schwimmer testified that, based upon Moran's representations, Nassau Kosher ended its relationship with General Security and entered into a contract with Commercial Fire. (Tr. 16; Pl. Ex. 60.)

B.    Reverend Regina Johnson – Hi Hello Child Care Center

37.   Reverend Johnson is the Executive Director of Hi Hello Child Care Center ("HH"),
      located in Freeport, New York. (Tr. 22-23.)

38.   HH had been an NYMP customer for years. (Tr. 23-25; Pl. Ex. 35.)

39.   In February 2017, Moran called and visited HH's office to solicit its alarm business.
      (Tr. 25-26.)

40.   Moran testified at his deposition that he received a lead for HH from Wahrsager.
      (Moran Dep. 147-48.)

41.   HH had no prior contact with Moran before his telephone call and had not contacted
      anyone about changing security companies. (Tr. 26.)

42.   Reverend Johnson met with Moran, who handed her a business card that identified
      him as a project engineer for Commercial Fire. (Tr. 27, 293; Moran Dep. 148; Pl. Ex.
      70.)

43.   Moran told Reverend Johnson that Commercial Fire previously owned NYMP, that
      NYMP was out of business or had closed, and that HH's account was no longer under
      contract with NYMP. (Tr. 27-29.)

44.   When Reverend Johnson asked Moran how he had so much information about HH's
      account, Moran advised her that he had a list of all NYMP accounts and that many
      customers were switching to Commercial Fire. (Tr. 28.)

45.   Reverend Johnson specifically asked Moran if HH was still under contract with
      NYMP, to which Moran replied they were not because NYMP was out of business or
      closed. (Tr. 28-29.)

46. Moran advised Reverend Johnson that HH's existing alarm system was inferior and did not adequately cover the building. (Tr. 28.)

47. Reverend Johnson testified that, based on Moran's representations, HH contracted with Commercial Fire. (Tr. 24; Pl. Ex. 23.)

48. General Security received a letter from Reverend Johnson stating that she received a visit from Moran, who introduced himself as a representative of Commercial Fire, stated that Commercial Fire was the previous owner of NYMP, offered her a cheaper rate for alarm services, advised her that her alarm system was inferior, and that if she was under  contract, she should not worry about it. (Tr. 24; Pl. Ex. 23.)

   C.   Grace Cirillo

49. Cirillo resides in Brooklyn, New York and was an NYMP customer since 2002. (Cirillo Dep. 9-10.)

50. In late 2012, Cirillo signed a five-year alarm monitoring contract with NYMP. (Cirillo Dep. 10-11.)

51. In February 2017, Moran telephoned Cirillo, advising her that NYMP had merged with General Security, that he used to work for General Security, that General Security was a "bad company" who had tried to steal NYMP accounts and that NYMP wanted the accounts back. (Cirillo Dep. 11-12.)

52. Moran further advised Cirillo that NYMP had gone out of business and that his company, Commercial Fire, had taken over NYMP's accounts. (Cirillo Dep. 12.)

53. Cirillo had no prior contact with Moran and had not contacted anyone about changing security companies. (Cirillo Dep. 11, 13.)

54. Cirillo agreed to meet with Moran in person. (Cirillo Dep. 13.)

55.     When Moran arrived at Cirillo's house, he gave her a business card identifying him as a representative of Commercial Fire and held a clipboard containing a list of names, addresses and phone numbers, including Cirillo's account with NYMP. (Cirillo Dep. 13-14.)

56.     Moran advised Cirillo that Commercial Fire was the new company, that Cirillo did not have a contract with NYMP anymore, and that Commercial Fire wanted to give her an upgrade. (Cirillo Dep. 14-15.)

57.     Cirillo testified at her deposition that, based upon Moran's representations, she signed a contract with Commercial Fire. (Cirillo Dep. 15.)

58.     Moran requested a credit card number, which Cirillo refused to provide, instead giving Moran $100 in cash as a deposit on the new equipment. (Cirillo Dep. 15.)

59.     Cirillo requested a copy of the contract, but Moran refused to provide one. Cirillo then took a photograph of the contract. (Cirillo Dep. 15-16.)

60.     Shortly thereafter, Cirillo received an invoice from General Security with a notice about a merger with NYMP. (Cirillo Dep. 16.)

61.     In response, Cirillo contacted General Security about her contacts with Moran and Commercial Fire. (Cirillo Dep. 16-17.)

62.     Commercial Fire installed a new alarm system for Cirillo on February 13, 2017. (Tr. 101.)

63.     Cirillo was still under contract with General Security until December 20, 2017. (Tr. 101; Pl. Ex. 23.)

64.　While General Security received back the multiple for Cirillo from the holdback

provision, it did not receive the anticipated revenue it expected to receive for Cirillo

based upon her account history. (Tr. 101; Pl. Ex. 23.)

　　D.　Vincent DeRosa

65.　DeRosa resides in Hauppauge, New York and was an NYMP customer since the

1990's. (Tr. 36-37.)

66.　In 2013, DeRosa signed a renewal contract with NYMP. (Tr. 40-41; Pl. Ex. 23.)

67.　Moran came to DeRosa's home and advised that there was some reorganization

happening at NYMP, making comments that led DeRosa to believe that NYMP had

transitioned into Commercial Fire. (Tr. 38-39.)

68.　Moran had a folder with numerous papers, including DeRosa's telephone number and

account number, and knew that DeRosa had a service contract with NYMP. (Tr. 39.)

69.　DeRosa advised Moran that he did not want to break his service contract with NYMP,

but Moran said he would take care of it. (Tr. 39.)

70.　DeRosa testified that, based upon Moran's representations, he signed a contract with

Commercial Fire. (Tr. 41-42; Pl. Ex. 60.)

　　E.　Richard Sayres – Holbrook MTA Auto Service

71.　Sayres is the owner of Holbrook MTA Auto Service ("HAS"), located in Holbrook,

New York. (Tr. 251-52.)

72.　In 2014, Sayres signed an alarm monitoring contract with NYMP, on behalf of HAS.

(Tr. 252; Pl. Ex. 23.)

73.　Sayres's contact person at NYMP after he signed the contract was Moran. (Tr.

253.)

74. Around March 2017, Sayres spoke with Moran, who told him that NYMP had gone bankrupt and led Sayres to believe that Commercial Fire bought the NYMP accounts and Moran was a representative of Commercial Fire. (Tr. 253-54.)

75. Sayres testified that, based upon Moran's representations, he signed an alarm monitoring contract with Commercial Fire, on behalf of HAS. (Tr. 253; Pl. Ex. 60.)

    F.    <u>Dr. Mila Sorkin – Smile Again Dental</u>

76. Dr. Sorkin is the owner of Smile Again Dental ("Smile Again"), located in Brooklyn, New York. (Sorkin Dep. 5-6.)

77. In 2013, Dr. Sorkin signed an alarm monitoring contract with NYMP, on behalf of Smile Again. (Sorkin Dep. 8.)

78. Around June 2017, Moran visited Smile Again to solicit its alarm business. (Sorkin Dep. 11-13.)

79. Moran told Dr. Sorkin that NYMP no longer existed and that Commercial Fire was taking over for NYMP. (Sorkin Dep. 11-13.)

80. Dr. Sorkin testified at her deposition that, based upon Moran's representations, she signed a contract with Commercial Fire, on behalf of Smile Again. (Sorkin Dep. 11-13.)

    G.    <u>Sandeep Patel – Trisha Food</u>

81. Patel was the owner of Trisha Food. (Tr. 258.)

82. In 2016, Patel contracted with NYMP for alarm service, on behalf of Trisha Food. (Tr. 259-60; Pl. Ex. 23.)

83. In or around April 2017, Moran telephoned Patel to solicit Trisha Food's alarm business. (Tr. 260-62; Pl. Ex. 60.)

84.     Patel had no prior contact with Moran and had not contacted anyone about changing security companies. (Tr. 260.)

85.     Moran advised Patel that he knew Trisha Food was an NYMP customer and that NYMP was now in the oil business. (Tr. 260-62.)

86.     Moran advised Patel that Trisha Food should sign a contract with Commercial Fire because Commercial Fire's system had more options than NYMP's. (Tr. 262.)

87.     Based on Moran's representations, Patel signed a contract with Commercial Fire on behalf of Trisha Food. (Tr. 262; Pl. Ex. 60.)

   H.     Michael Lepine – Empire Market

88.     Lepine is an owner of Empire Market, located in College Point, New York. (Tr. 265.)

89.     Empire Market had a contract with NYMP for alarm services. (Tr. 265-66; Pl. Ex. 23.)

90.     In 2017, Moran visited Empire Market and spoke with Lepine's father, who owned the store at the time. (Tr. 267, 269.)

91.     Lepine overheard Moran's conversation with his father, during which Moran advised Lepine's father that Commercial Fire used to own NYMP and that now they had it back. (Tr. 267-68.)

92.     Based on Moran's representations, Lepine's father signed a contract with Commercial Fire, on behalf of Empire Market. (Tr. 269; Pl. Exs. 57, 60.)

   I.     Other Customers as Testified to by John Lupino

      1.     Rita Abelson

93.     Rita Abelson ("Abelson") was a customer of NYMP. (Tr. 88-89; Pl. Ex. 23.)

94.     In or around December 2015, Abelson called General Security and advised that
        Commercial Fire was contacting her. (Tr. 88-89.)

95.     General Security's customer service representative created a memo regarding the call
        with Abelson, wherein Abelson stated that she was no longer with NYMP and that
        she had obtained alarm service through Wahrsager. (Tr. 89-90; Pl. Ex. 23.)

96.     General Security informed Abelson that she was still under contract with it through
        2017, at which time Abelson reported that Wahrsager told her he would take care of
        everything. (Tr. 89-90.)

        2.      Roberta Brown

97.     Roberta Brown ("Brown") was a residential NYMP customer acquired through the
        Purchase Agreement. (Tr. 107.)

98.     Brown was under contract with General Security until 2018. (Tr. 108; Pl. Ex. 33.)

99.     Brown called General Security and stated that her old alarm company contacted her,
        said they were resuming business, and were trying to get their clients back. (Tr. 110;
        Pl. Ex. 34.)

100.    General Security advised Brown that she was still under contract. (Tr. 110.)

101.    Brown stated that Commercial Fire had offered her a better price and that she had
        signed with them. (Tr. 110.)

        3.      Bushwick Economic Development Corporation

102.    Bushwick Economic Development Corporation ("Bushwick") was a customer of
        General Security through NYMP who was under contract through July 2017. (Tr.
        117; Pl. Ex. 38.)

103.   Bushwick spoke with Moran and then advised General Security that Moran said that

NYMP was going out of business and that he represented the original company. (Tr.

117.)

       4.     <u>Frank and Angela DiPalo</u>

104.   Frank and Angela DiPalo (the "DiPalos") were customers of General Security

through the Purchase Agreement, whose contract ran through 2018. (Tr. 119-20; Pl.

Ex. 42.)

105.   Mrs. DiPalo contacted General Security, advising that Moran had called and tried to

convince them to change to Commercial Fire. (Tr. 120-22; Pl. Ex. 41.)

106.   Moran offered the DiPalos a brand-new system, stated that Commercial Fire was a

local company based out of Queens, New York, and told them that General Security

was not a great company and that it sold oil. (Tr. 120-22.)

107.   The DiPalos ultimately decided to stay with General Security. (Tr. 122.)

       5.     <u>Louis DeMatteo</u>

108.   Louis DeMatteo ("Matteo") was a customer of General Security through the

Purchase Agreement, whose contract with General Security ran through 2017. (Tr.

122-25; Pl. Ex. 44.)

109.   DeMatteo advised General Security that Moran had telephoned him on behalf of

Wahrsager and stated that they were getting back into the alarm business. (Tr. 126;

Pl. Ex. 43.)

110.   Moran told Matteo that he was not under contract with General Security. (Tr. 126.)

111.   General Security advised Matteo that he was still under contract. (Tr. 126.)

6.    Earl Garrison

112.   Earl Garrison ("Garrison") was a customer of General Security through the

Purchase Agreement, whose contract ran through 2017. (Tr. 127; Pl. Ex. 46.)

113.   On or about May 24, 2017, Garrison sent a note to General Security, stating that he

was terminating his alarm service and had decided to switch to Moran's company.

(Tr. 128-29; Pl. Ex. 45.)

7.    Alex's Jewelry

114.   Alex's Jewelry was a customer of General through the Purchase Agreement, with a

ten-year contract set to expire in 2023. (Tr. 129-30; Pl. Ex. 50.)

115.   Moran attempted to solicit Alex's Jewelry's business for a cheaper rate; Alex's

Jewelry did not want to leave General Security but inquired as to whether General

Security could provide a cheaper rate. (Tr. 131; Pl. Ex. 47-49.)

8.    Tish & Snooky's Manic Panic

116.   Tish & Snooky's Manic Panic ("Tish & Snooky") was customer of General

Security acquired through the Purchase Agreement, whose contract ran through 2017.

(Tr. 132-33; Pl. Ex. 52.)

117.   Tish & Snooky contacted General Security concerned that it was going out of

business, as represented to them by Moran. (Tr. 134; Pl. Ex. 51.)

9.    Delmar

118.   Delmar was a customer of General Security acquired through the Purchase

Agreement. (Tr. 136; Pl. Ex. 53.)

119.   Wahrsager advised Delmar that General Security was going out of business. (Tr.

136.

10.     Caribbean Multi-Service

120.    General Security obtained this account through the Purchase Agreement, with a

contract dated September 8, 2015, with a five-year term. The monthly charge on the

account was $30.95, payable quarterly. (Tr. 173; Pl. Ex. 23.)

121.    As of September 2018, the Caribbean Multi-Service account was listed as terminated

in General Security's computer system. (Tr. 174.)

122.    General Security contacted Caribbean Multi-Service on October 17, 2017 following a

failure to achieve communications from the customer's alarm panel, at which time

Caribbean Multi-Service advised General Security that it had switched alarm

companies six months prior. (Tr. 207.)

123.    The last invoice paid by Caribbean Multi-Service was dated November 16, 2017, for

services through February 2018. (Tr. 230.)

11.     Princess European Cleaners

124.    This account was acquired by General Security through the Purchase Agreement with

a contract dated June 19, 2014, with a five-year term. The monthly charge on the

account was $29.47, payable monthly. (Tr. 177; Pl. Ex. 23.)

125.    General Security contacted Princess European Cleaners ("Princess") in May 2018, at

which time it was advised by the customer that business was slow and they could not

afford the alarm system. (Tr. 205.)

126.    On July 30, 2018, Princess cleaners notified General Security that they were closing

the business and moving. (Tr. 206.)

127.    General Security terminated the system that same day and quoted Princess an early termination fee of $400.00 (which amounted to approximately fourteen months at the contract's monthly rate), of which Princess paid an unknown portion. (Tr. 206.)

      12.    Harbor Wines & Liquors

128.    General Security purchased this account through the Purchase Agreement, with a contract dated November 19, 2013, with a five-year term. The monthly charge was $35.08, payable quarterly. (Tr. 234; Pl. Ex. 23.)

129.    As of June 2018, the Harbor Wines & Liquors ("Harbor Wines") account was listed as terminated in General Security's computer system. (Tr. 179.)

130.    General Security contacted Harbor Wines in January 2018 regarding unpaid invoices and was advised that Harbor Wines had faxed a termination notice in May 2017. (Tr. 202.)

131.    The last paid invoice for Harbor Wines was May 16, 2017, paid on June 23, 2017, for service through August 2017. (Tr. 202, 234.)

      13.    Jonathan & Susan Gaska

132.    Jonathan and Susan Gaska's (the "Gaskas") alarm account was acquired by General through the Purchase Agreement, with a contract dated March 26, 2014, with a one-year term. The monthly charge was $48.55, payable quarterly. (Tr. 181; Pl. Ex. 23.)

133.    When the Gaskas' account was purchased, it was in month-to-month status. (Tr. 181.)

134.    The last paid invoice for the Gaskas' account was May 16, 2017, which was paid in August 2017.  (Tr. 200.)

135.    In August 2017, the Gaskas called General Security to cancel the alarm account and advised that they had faxed a termination notice. (Tr. 200.)

136.    The termination was processed by General Security in March 2018, retroactive to August 2017. (Tr. 201.)

137.    The Gaskas account could have been terminated at any time upon thirty-days-notice and a payment of $48.55. (Tr. 231.)

14.    Mr. & Mrs. Pat Groom

138.    General Security purchased Mr. & Mrs. Groom's (the "Grooms") account as part of the Purchase Agreement, with a contract dated March 19, 2013, with a five-year term. The monthly charge was $50.42, payable annually. (Tr. 183-84 Pl. Ex. 23.)

139.    The last paid invoice for the Grooms' account was May 1, 2018, which was paid in August 2018. (Tr. 200.)

140.    At that time, the term of the contract had expired and the account was in month-to-month status at $50.42 per month. (Tr. 229.)

141.    In April 2018, Mrs. Groom called General Security regarding her account and advised that she could no longer afford the alarm service because her husband had passed away. (Tr. 200.)

142.    General Security terminated the Grooms' account as of June 2018. (Tr. 184.)

143.    The Grooms' account could have been terminated at any time by the customer upon thirty-days-notice and a payment of $50.42. (Tr. 229.)

15.    Joseph Hamilton

144.    Joseph Hamilton's ("Hamilton")  account was acquired by General Security as part of the Purchase Agreement, with a contract dated December 1, 2012, with a five-year term. The monthly charge was $26.25, payable annually. (Tr. 185; Pl. Ex. 23.)

145.   Hamilton advised General Security that he wished to terminate his alarm service in March 2018 and submitted a termination form two months later. (Tr. 202.)

146.   Hamilton's account was terminated by General Security in May 2018, with the last paid invoice dated October 16, 2017, which was paid in May 2017 and covered service through October 2018. (Tr. 202, 233.)

   16.   On Target Automotive Special

147.   General Security purchased this account through the Purchase Agreement, with a contract dated June 26, 2013, with a five-year term. The monthly charge was $72.11, payable quarterly. (Tr. 186; Pl. Ex. 23.)

148.   The account was terminated by General Security in April 2018, with the last paid invoice dated April 1, 2018, which was paid in May 2018 and covered service through June 2018 – the final month of the contract. (Tr. 187, 234-36.)

149.   The account could have been terminated at any time by the customer upon thirty-days-notice and a payment of $72.11 (Tr. 236.)

   17.   Parthenon Framing

150.   General Security purchased Parthenon Framing's ("Parthenon") account via the Purchase Agreement, with a contract dated April 17, 2013, with a five-year term. The monthly charge was $64.01, payable quarterly. (Tr. 236; Pl. Ex. 23.)

151.   Parthenon provided General Security with notice of termination on November 1, 2017, with a last paid invoice dated April 21, 2017, which was paid in December 2017 and covered service through November 2017. (Tr. 204, 236.)

152.   Had Parthenon's contract expired by its terms, General Security would have been entitled to receive $64.01 a month for approximately four and one-half months. (Tr. 236-37.)

18.   Seymor Pincus

153.   General purchased this account through the Purchase Agreement, with a contract dated February 1, 2013, with a five-year term. The monthly charge was $29.95, payable quarterly. (Tr. 237-38; Pl. Ex. 23.)

154.   The account was terminated by General Security as of May 2018, after communications with Mr. Pincus regarding a termination notice he said he sent in October 2017. (Tr. 205.)

155.   The last paid invoice on the account was dated December 15, 2017 and covered service through March 2018 – the final date of the contract. (Tr. 238.)

156.   The account could have been terminated at any time by the customer upon thirty-days-notice and a payment of $29.95. (Tr. 238.)

19.   Baxter Sports Shop

157.   General Security purchased this account via the Purchase Agreement, with a contract dated May 23, 2014, with a five-year term. The monthly charge was $104.44, payable quarterly. (Pl. Ex. 75; DE [77].)

158.   General Security contacted Baxter Sports Shop on or about December 12, 2017 regarding communication trouble on the alarm system and was advised by the customer that they were switching their alarm service to another company. (DE [77].)

159.   After several further communication attempts with the customer, the account was cancelled on August 22, 2018. (DE [77].)

160. The last paid invoice was dated October 16, 2017, which was paid on October 30, 2017 and covered service through January 2018. (DE [77].)

   20.   Miscellaneous Customers

161. Moran advised two separate clients of General Security, Mr. Douglas and Mrs. Cohen, that General Security was going out of business. (Tr. 137-38; Pl. Ex. 54.)

162. Moran contacted another General Security client, Mrs. Falzetta, regarding taking over her alarm contract for an upgrade. (Tr. 138-39; Pl. Ex. 55.)

163. A General Security customer, Eveready Enterprises, cancelled their account with General Security and switched to Commercial Fire. (Tr. 140; Pl. Ex. 56.)

V.   Communications Between General Security and Commercial Fire

164. On February 27, 2017, General Security's counsel sent a letter to Commercial Fire accusing Wahrsager and Moran of contacting NYMP customers and making disparaging comments about General Security. The letter further accused Commercial Fire of improperly relying upon confidential account information and misusing the trade name NYMP. (Tr. 304; Pl. Ex. 37.)

165. By that same letter, Commercial Fire was put on notice to preserve all documents and communications with NYMP customers as of November 1, 2016. (Tr. 305; Pl. Ex. 37.)

166. All of the sixty-nine contracts entered into between Commercial Fire and former NYMP/General Security customers were signed in January 2017 and later. (Tr. 305; Pl. Ex. 60.)

167. Many of the contracts were signed after the February 27, 2017 cease and desist letter. (Tr. 306; Pl. Ex. 60.)

168.   None of the newly gained contracts were customers of Commercial Fire prior to 2017. (Tr. 306.)

169.   Wahrsager testified that he did not know how Commercial Fire found the sixty-nine accounts at issue in this action. (Tr. 306.)

170.   With the exception of one account – Rockaway Laundry – all sixty-nine accounts gained by Commercial Fire were NYMP customers when Wahrsager was associated with NYMP prior to 2011. (Tr. 148; Pl. Ex. 58.)

VI.    <u>Damages</u>

171.   Lupino testified that the monthly revenue from the sixty-nine accounts lost to Commercial Fire totaled $3,623.22. Each year, that revenue would total $43,478.64 (Tr. 144-45; Pl. Ex. 58.)

172.   This amount does not include extras, such as upgrades, repairs, and service calls. (Tr. 144-45.)

173.   Using a twelve-year calculation of the RMR, the expected revenue from the sixty-nine accounts would total $521,743.68. (Tr. 148; Pl. Ex. 58.)

174.   Lupino testified that he used a twelve-year calculation rate because "it's not typical for an account to last only one year with an alarm company" and that "industry reports will show that customers tend to stay for many more than one single year." (Tr. 149.) According to Lupino, based on that knowledge, he felt that twelve years was an "adequate representation." (Tr. 220.)

175.   As of the time of the trial of this action, General Security still possessed 1,666 of the accounts acquired through the Agreement, which equates to an approximate twelve percent attrition rate. (Tr. 221-22.)

CONCLUSIONS OF LAW

I.      Defend Trade Secrets Act ("DTSA") Claim

        A.      Legal Standard

1.      Pursuant to the DTSA, the "owner of a trade secret that is misappropriated may
        bring a civil action . . . if the trade secret is related to a product or service used in, or
        intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); see also
        Kairam v. West Side GI, LLC, 793 Fed. App'x 23, 27 (2d Cir. 2019).

2.      To establish a claim under the DTSA, a party must demonstrate "an uncontested
        disclosure or use of a trade secret by one who (i) used improper means to acquire the
        secret, or (ii) at the time of disclosure, knew or had reason to know that the trade
        secret was acquired through improper means, under circumstances giving rise to a
        duty to maintain the secrecy of the trade secret, or derived from or through a person
        who owed such a duty." In re Document Techs. Litig., No. 17-CV-2405, 2017 WL
        2895945, at *5 (S.D.N.Y. July 6, 2017) (citation and internal quotation marks
        omitted).

3.      Under the DTSA, "trade secrets" encompass:

        [A]ll forms and types of financial, business, scientific, technical, economic, or
        engineering information, including patterns, plans, compilations, program
        devices, formulas, designs, prototypes, methods, techniques, processes,
        procedures, programs, or codes, whether tangible or intangible, and whether or
        how stored, compiled, or memorialized physically, electronically, graphically,
        photographically, or in writing if –

        (A) the owner thereof has taken reasonable measures to keep such information
        secret; and
        (B) the information derives independent economic value, actual or potential,
        from not being generally known to, and not being    readily        ascertainable
        through proper means by, another person who can obtain economic value from
        the disclosure or use of the information.

18 U.S.C. § 1839(a); see also Archie MD, Inc. v. Elsevier, Inc., No. 16-cv-6614, 2017 WL 3421167, at *12 (S.D.N.Y. Mar. 13, 2017).

4.     Courts consider several factors in determining whether information qualifies as a trade secret, including: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of the measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and, (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. See Iacovacci v. Brevet Holdings, LLC, 18cv8048, 2020 WL 528059, at *8 (S.D.N.Y. Feb. 3, 2020) (citing Integrated Cash Mgmt. Servs, Inc. v. Digital Transactions, Inc., 930 F.2d 171, 173 (2d Cir. 1990)).

5.     "[C]ustomer lists may, in appropriate circumstances, come within the broad definition of trade secrets under the DTSA." M&A Metals, Inc. v. Fina, 21-CV-5570, 2023 WL 2734794, at *5 (E.D.N.Y. Mar. 31, 2023) (citing 18 U.S.C. § 1839(3)).

    B.     Analysis of the Claim

6.     General Security's customer list is a compilation of valuable business records that derives economic value from not being readily ascertainable, which General Security attempted to keep confidential. (Tr. 51-53, 59-61, 85.) As such, the Court finds that General Security's customer list constitutes a trade secret within the meaning of the DTSA.

7.     In order to find Commercial Fire liable under the DTSA, General Security must have proven that Commercial Fire obtained its customer list through improper means or that Commercial Fire used its customer list "without express or implied consent." 18 U.S.C. § 1839(5).

8.     General Security established at trial that it did not consent to Commercial Fire's use of its customer information. (Tr. 64, 73, 84.)

9.     The basis for General Security's DTSA claim is that Wahrsager had access to its customer information before he was terminated from NYMP in 2011 and that he used that information to solicit General Security's customers after forming Commercial Fire. (Tr. 80, 273, 284, 302; Pl. Ex. 2.)

10.     While Cirillo and Reverend Johnson testified that Moran had a list of General Security's customers, (Tr. 13-14; 28), there is no documentation showing how Commercial Fire obtained the customer lists at issue – or if they did at all. (Tr. 301.)

11.     Moreover, although Wahrsager was precluded from soliciting NYMP's customers as a result of the consent judgment entered into in 2011, that non-compete provision expired in March 2014, approximately three years prior to the actions complained of herein.

12.     The Court finds that General Security has failed to establish, by a preponderance of the evidence, that Defendants misappropriated its customer list. Wahrsager and Moran had prior relationships – through NYMP – with the customers they solicited from General Security. They could have simply remembered their former customers. There is no evidence that Wahrsager or Moran maintained any files after leaving NYMP or that they had access to any of General Security's account records. It could

25

be nothing more than pure coincidence that Commercial Fire solicited General

Security's customers. Without more, General Security is unable to maintain a

claim for misappropriation of trade secrets under the DTSA and the claim is hereby

dismissed.

II.    Lanham Act Claims

    A.    Legal Standard

13.    Section 43(a) of the Lanham Act codifies two distinct causes of action: (1) false

designation of origin or source ("false designation") claims and (2) false description

or representation ("false advertising") claims. See Pulse Creations, Inc. v. Vesture

Grp., Inc., 154 F. Supp. 3d 48, 56 (S.D.N.Y. 2015) (citation omitted).

    1.    False Designation

14.    Section 1125(a)(1)(A) of the Lanham Act "prohibits any misleading representation of

fact that is 'likely to cause confusion, or to cause mistake, or to deceive as to the

affiliation connection, or association of such person with another person, or as to the

origin, sponsorship, or approval of his or her goods, services, or commercial activity

by another person.'" Cree, Inc. v. Xiu Ping Chen, No. 16-cv-1065, 2017 WL

3251580, at *4 (E.D.N.Y. July 28, 2017) (quoting 15 U.S.C. § 1125(a)).

15.    False designation claims are analyzed under the same standard as claims for

trademark infringement, except that "Section 1125(a) protects unregistered marks if

they would qualify for registration as trademarks," and Section 1114(a) "protects only

registered marks." Cree, 2017 WL 3251580, at *4. Thus, a trademark is not required

to prevail on a false designation claim. See Jackson v. Odenat, 9 F. Supp. 3d 342, 354

(S.D.N.Y. 2010).

16.     To prevail on a false designation claim, a plaintiff must establish two elements: "(1)

        that it has a valid trademark entitled to protection under the [Lanham] Act, and (2)

        defendant's actions are likely to cause confusion." <u>Van Praagh v. Gratton</u>, 993 F.

        Supp. 2d 293, 301 (E.D.N.Y. 2014) (citation and internal quotation marks omitted).

17.     While the Lanham Act "does not prohibit false statements generally," it prohibits

        "false or misleading descriptions or false or misleading representations of fact made

        about one's own or another's goods or services." <u>S.C. Johnson & Son, Inc. v. Clorox

        Co.</u>, 241 F.3d 232, 238 (2d Cir. 2001) (citation omitted).

        2.     <u>False Advertising</u>

18.     Section 1125(a)(1)(B) of the Lanham Act prohibits individuals and businesses

        engaged in commercial advertising or promotion from "misrepresent[ing] the nature,

        characteristics, qualities, or geographic origin of his or her or another's goods,

        services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

19.     To prevail on a false advertising claim under the Lanham Act, a plaintiff must

        establish five elements: "(1) a false or misleading statement (2) in connection with

        commercial advertising or promotion that (3) was material, (4) was made in interstate

        commerce, and (5) damaged or will likely damage the plaintiff." <u>Sussman-Automatic

        Corp. v. Spa World Corp.</u>, 15 F. Supp. 3d 258, 269 (E.D.N.Y. 2014).

20.     "A claim of false advertising may be based on at least one of two theories: 'that the

        challenged advertisement is literally false, <u>i.e.</u>, false on its face' or 'that the

        advertisement, while not literally false, is nevertheless likely to mislead or confuse

        customers.'" <u>Tiffany (NJ) Inc. v. eBay Inc.</u>, 600 F.3d 93, 112 (2d Cir. 2010) (quoting

        <u>Time Warner Cable, Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 153 n.3 (2d Cir. 2007)).

21.   "[T]he touchstone of whether a defendant's actions may be considered 'commercial
      advertising or promotion' under the Lanham Act is that the contested representations
      are part of an organized campaign to penetrate the relevant market." Merck Eprova
      AG v. Brookstone Pharms., LLC, 920 F. Supp. 2d 404, 416-17 (S.D.N.Y. 2013)
      (quoting Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57
      (2d Cir. 2002)).

22.   "Proof of widespread dissemination within the relevant industry is a normal
      concomitant of meeting this requirement." Fashion Boutique, 314 F.3d at 57.

   B.   Analysis of the Lanham Act Claims

23.   The evidence put forth during the bench trial amply demonstrates that Defendants
      made numerous statements to General Security's customers intended to confuse
      them with respect to the affiliation between General Security, Commercial Fire
      and NYMP. (Tr. 15-16, 27-29, 38, 117, 120-22, 253-54, 260-62, 268, 311-12;
      Cirillo Cep. 12; Sorkin Dep. 11-13; Moran Dep. 120.)

24.   General Security has proven, by a preponderance of the evidence, that
      Defendants' actions violated Section 1125(a)(1)(A) of the Lanham Act. Judgment
      is entered in General Security's favor with respect to its false designation claim.

25.   The evidence adduced at trial also amply demonstrates that Defendants made
      multiple false or misleading statements to General Security's customers with
      respect to, among other things, General Security having merged with NYMP,
      Commercial Fire taking over NYMP's accounts, and that customers were no
      longer under contract with General Security when, in fact, they were. (Tr. 28-29,
      39, 254, 268; Cirillo Dep. 11-12, 14.)

28

26. The evidence further demonstrates that Defendants' false statements were made in connection with their commercial advertising and the promotion of their alarm company.

27. The false and misleading statements made by Defendants induced certain of General Security's customers to prematurely cancel their contracts with General Security and to enter into contracts with Commercial Fire. (Tr. 16, 24, 41-42, 89-90, 109, 128-29, 144-45, 253, 262,. 269; Cirillo Dep. 15; Sorkin Dep. 11-13.)

28. General Security has proven, by a preponderance of the evidence, that Defendants' actions violated Section 1125(a)(1)(B) of the Lanham Act. Judgment is entered in General Security's favor with respect to its false advertising claim.

III. <u>New York General Business Law § 360-l – Trademark Dilution</u>

 A. <u>Legal Standard</u>

29. Pursuant to Section 360-l of the New York General Business Law, a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief . . . notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 113-14 (2d Cir. 2009); <u>see also</u> <u>Kuklachev v. Gelfman</u>, 600 F. Supp. 2d 437, 475 (E.D.N.Y. 2009).

30. "New York law protects against dilution be either blurring or tarnishment when marks are either inherently distinctive or distinctive as a result of secondary meaning." <u>Kuklachev</u>, 600 F. Supp. 2d at 475 (citation omitted).

31.     To succeed on a claim pursuant to Section 360-l, a plaintiff must "prove '(1) that it possess[es] a strong mark – one which has a distinctive quality or has acquired secondary meaning . . . and (2) a likelihood of dilution by either blurring or tarnishment.'" RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc., 527 F. Supp. 3d 305, 330 (E.D.N.Y 2021) (quoting Fireman Ass'n of State of N.Y. v. French Am. Sch. of N.Y., 839 N.YS.2d 238, 241-42 (3d Dep't 2007)).

32.     General Security alleges trademark dilution by blurring only.

        1.     Distinctive Mark

33.     General Security acquired the NYMP tradename and logo through the Purchase Agreement. (Tr. 62.)

34.     Lupino testified that during General Security's purchase of NYMP, there was considerable discussion about why the NYMP tradename and logo were important – specifically, that the tradename and logo were "well-established" and "well-known." (Tr. 62.)

        2.     Blurring

35.     "Dilution by blurring refers to the gradual diminishment of a famous mark's acquired 'ability to clearly and unmistakably distinguish one source through unauthorized use.'" Coty Inc. v. Excell Brands, LLC, 277 F. Supp. 3d 425, 458 (S.D.N.Y. 2017) (quoting Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 506 (2d Cir. 1996)). "Put differently, dilution occurs when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular." Coty Inc., 277 F. Supp. 3d at 458 (citation and internal quotation marks omitted).

36.     Courts in the Second Circuit consider six factors when determining whether
        dilution by blurring has occurred under New York law: "(i) the similarity of the
        marks; (ii) the similarity of the products covered; (iii) the sophistication of the
        customers; (iv) the existence of predatory intent; (v) the renown of the senior
        mark; and (vi) the renown of the junior mark." George Nelson Found. v.
        Modernica, Inc., 12 F. Supp. 3d 635, 651 (S.D.N.Y. 2014) (quoting Starbucks,
        588 F.3d at 114); see also N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC, 293
        F.3d 550, 558 (2d Cir. 2002).

        B.      Plaintiff has Failed to Prove its Claim of Trademark Dilution

37.     The Second Circuit has held that the marks in question "must be 'very' or
        'substantially' similar and that, absent such similarity, there can be no viable
        claim of dilution." Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,
        865 F.2d 1026, 1029 (2d Cir. 1989).

38.     While General Security argues that the marks in question are substantially similar,
        the evidence before the Court does not establish such similarity. While an
        argument could be made that the two marks look somewhat alike, there is not the
        substantial similarity required to establish trademark dilution. (Pl. Exs. 20, 30.)

39.     Moreover, the testimony provided at the bench trial established that Moran
        provided Cirillo with a lawn sign after she signed a contract with Commercial
        Fire. (Tr. 104; Pl. Ex. 30.) That lawn sign says "protected by United States
        Merchants Protective Company Inc." (Tr. 105; Pl. Ex. 30.) Such an entity is not a
        party to this action. While the testimony at trial established that Wahrsager's son
        operates a company called "United States Merchants Protective Company" out of

31

the same address as Commercial Fire, (Tr. 335), there are simply no claims herein against that entity and a lawn sign bearing that logo has no connection to the claims herein.

40.    For these reasons, the Court finds that General Security has failed to prove its claim of trademark dilution in violation of Section 360-l of the New York General Business Law. As such, the claim is hereby dismissed.

IV.    <u>Tortious Interference with Contract</u>

A.    <u>Legal Standard</u>

41.    To succeed on a claim of tortious interference with contract under New York law, a plaintiff must prove "the existence of a valid contract between the plaintiff and a third-party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88 N.Y.2d 413, 423 (1996) (citations omitted).

B.    <u>Analysis of the Claim</u>

42.    The evidence adduced at trial established that Commercial Fire solicited present contracted customers of General Security and, in many cases, was successful in acquiring that customer's business.

43.    As several witnesses testified, Moran – on behalf of Commercial Fire – had substantial information about their alarm accounts with NYMP (now General Security) when he sought to obtain their business. Accordingly, the Court finds that Commercial Fire had knowledge of the customers' contracts with General Security.

44.    Defendants' actions were intended to induce General Security's customers to breach their contracts and switch their alarm services to Commercial Fire, which happened with many customers, resulting in monetary damages to General Security.

45.    Accordingly, General Security has proven its claim for tortious interference with contract by a preponderance of the evidence and judgment is entered in its favor with respect to this claim.

V.    Tortious Interference with Prospective Economic Advantage

       A.    Legal Standard

46.    To prevail on a claim for tortious interference with prospective business relations under New York law, a plaintiff must prove "(1) that it had a business relationship with a third party; (2) that defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that the defendant's interference caused injury to the relationship with the third party." Amaranth LLC v. J.P. Morgan Chase & Co., 888 N.Y.S.2d 489 (1st Dep't 2009).

47.    "'Wrongful means' includes physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure, but more than simple persuasion is required." Snyder v. Sony Music Entmt., Inc., 684 N.Y.S.2d 235, 300 (1st Dep't 1999) (citation omitted).

       B.    Analysis of the Claim

48.    It is unclear to the Court who the third parties are that General Security alleges to have had a relationship with in which Commercial Fire interfered. This evidence was

not properly fleshed out during trial. The Court assumes that General Security is referring to the non-contracted, or month-to-month customers, that it acquired from NYMP pursuant to the Purchase Agreement. However, the evidence put forth during trial pertained to only the contracted customers whose business Commercial Fire solicited – which forms the basis for Plaintiff's tortious interference with contract claim. Moreover, General Security failed to offer any evidence of "wrongful means" on Defendants' part. For this reason, the Court finds that General Security has failed to prove its claim for tortious interference with prospective economic advantage by a preponderance of the evidence. Accordingly, the claim is dismissed.

VI.   Misappropriation of Trade Secrets

    A.   Legal Standard

49.   The elements of a misappropriation of trade secrets claim under New York law are "fundamentally the same" as the elements under the DTSA. Iacovacci v. Brevet Holdings, LLC, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citing N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999)).

    B.   Analysis of the Claim

50.   As the Court has already found that General Security has failed to prove its DTSA claim by a preponderance of the evidence, the same reasoning is fatal to its misappropriation of trade secrets. Accordingly, the claim is dismissed.

VII.   Unjust Enrichment

    A.   Legal Standard

51.   To prevail on a claim for unjust enrichment under New York law, a plaintiff must demonstrate that "(1) the other party was enriched, (2) at that party's expense, and

(3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (2011) (citation and internal quotation marks omitted) (alteration in original).

52.   Unjust enrichment "is an equitable claim that is unavailable where an adequate remedy at law exists." Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V., 400 Fed. App'x 611, 613 (2d Cir. 2010).

53.   "[A]n unjust enrichment claim 'is not available where it simply duplicates, or replaces, a conventional contract or tort claim.'" Weisblum v. Prophase Labs, Inc., 88 F. Supp. 3d 283, 296-97 (S.D.N.Y. 2015) (quoting Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2012)) (emphasis omitted).

  B.   Analysis of the Claim

54.   As the Court has already found that Commercial Fire is liable in tort to General Security, a claim for unjust enrichment cannot lie. Accordingly, the claim is hereby dismissed.

VIII.   Relief Sought

55.   General Security requests a permanent injunction be entered against Commercial Fire, as well as compensatory damages in the amount of $521,743.68.

  A.   Permanent Injunction

56.   To demonstrate entitlement to a permanent injunction, General Security must show both: (1) irreparable harm, and (2) success on the merits. See Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd., 302 F. Supp. 2d 205, 225 (S.D.N.Y. 2004) (citing Univ. of Texas v. Camenisch, 451 U.S. 390, 392 (1981)).

57.   "[T]he standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits." <u>Dodge v. County of Orange</u>, 282 F. Supp. 2d 41, 71 (S.D.N.Y. 2003) (citing <u>Amoco Prod. Co. v. Vill. of Gambell</u>, 480 U.S. 531, 546 n.12 (1987)).

58.   As General Security has proven successful on the merits of its Lanham Act claims, as well as its claim for tortious interference with contract, the Court grants a permanent injunction, enjoining Defendants from: (1) contacting any NYMP customers; (2) relying upon any NYMP materials or proprietary information, such as lawn signs, customer lists, customer contact information, pricing history, or other account information; (3) making any statements on General Security's acquisition of NYMP or the propriety of such acquisition; and, (4) making any representations on General Security's ownership of NYMP accounts. As the Court has found that General Security did not succeed with respect to its DTSA and misappropriation of trade secrets claims, it declines to award injunctive relief directing Defendants to return any NYMP proprietary information and/or trade secret, as requested by General Security.

   B.   <u>Damages</u>

59.   General Security seeks compensatory damages in the amount of $521,743.68, which represents the monthly revenue for all sixty-nine accounts acquired by Commercial Fire – $3,623.22 per month, or $43,478.64 per year – for a total of twelve years.

60.   As Lupino testified, General Security employed a twelve-year RMR calculation because it felt that was an "adequate representation" of the amount of time it

would expect an alarm customer to maintain its account with General Security, based on industry standards. (Tr. 149, 220.)

61.     As set forth above, of the sixty-nine accounts acquired by General Security through the Agreement, fifty-six fell within the holdback period. Under the Agreement, General Security did not pay for those fifty-six accounts. For the thirteen accounts that were not subject to the holdback agreement, General Security paid $22,178.82. (Tr. 151; Pl. Ex. 74.)

62.     Contrary to General Security's arguments, this Court finds that Defendants are only liable with respect to the thirteen accounts acquired from General Security that did not fall within the holdback period. Accordingly, the Court will award damages only with respect to those thirteen accounts.

63.     Eleven of the thirteen accounts were contracted accounts; two were not. (Tr. 151.)

64.     As Lupino testified, using a twelve-year RMR for those thirteen accounts amounts to $91,036.80 in lost revenue. (Tr. 151.) Accordingly, the Court awards General Security damages in the amount of $91,036.80.

65.     Judgment shall be entered jointly and severally against all Defendants.

<u>CONCLUSION</u>

For the foregoing reasons, the Court holds that Plaintiff has successfully proven its claims of false designation of origin and false advertising, pursuant to the Lanham Act, as well as its claim for tortious interference with contract. Plaintiff's remaining claims are dismissed.

General Security is hereby awarded $91,036.80 in compensatory damages and a permanent injunction enjoining Defendants from: (1) contacting any NYMP customers; (2) relying upon any NYMP materials or proprietary information, such as lawn signs, customer lists, customer

contact information, pricing history, or other account information; (3) making any statements on General Security's acquisition of NYMP or the propriety of such acquisition; and, (4) making any representations on General Security's ownership of NYMP accounts. The Clerk of the Court is directed to enter judgment jointly and severally against all Defendants and to thereafter close this case.

**SO ORDERED.**

Dated:  Central Islip, New York
      May 24, 2023                          /s/      Anne. Y. Shields
                                      ANNE Y. SHIELDS
                                        United States Magistrate Judge